**C.J. GIROIR, Jr. and Stock, Inc., Plaintiffs,**

v.

**MBANK DALLAS, N.A., Defendant,**

**Federal Savings & Loan Insurance Corporation, Intervenor.**

**Civ. No. LR–C–76–531.**

United States District Court, E.D. Arkansas, W.D.

Nov. 25, 1987.

Bruce W. Claycombe, Jones, Claycombe & King, Dallas, Tex., H. Sam Hilburn, Hilburn, Calhoon, Harper & Pruniski, Ltd., North Little Rock, Ark., for plaintiffs.

Winstead, McGuire, Sechrest & Minick, P.C., Dallas, Tex., Robert L. Robinson, Jr., William T. Marshall, Scotty Shively, Hatfield, Robinson, Hodges, Staley, Marshall, Jordan & Shively, Little Rock, Ark., for Mbank.

Doug Smith, Alan Wooten, Warner & Smith, Forth Smith, Ark., Linda Newman, Graham & Jones, Los Angeles, Cal., for Balder Corp.

Donna Mixon, Peter Lovato, Robert Patterson, Hopkins & Sutter, Chicago, Ill., Peter Heister, James W. Cherry, Eichenbaum, Scott, Miller, Liles & Heister, Little Rock, Ark., for Federal Sav. and Loan Ins. Corp.

## MEMORANDUM OPINION

MORRIS SHEPPARD ARNOLD, District Judge.

In January, 1986, plaintiff C.J. Giroir, Jr., obtained from defendant MBank Dallas an irrevocable letter of credit [1] in the amount

---

1. "A letter of credit is a commitment on the part of the issuing bank [to a person] that it will pay a draft or demand for payment presented to it [by a third person] under the terms of the credit." *United Technologies Corp. v. Citibank, N.A.,* 469 F.Supp. 473, 477 (S.D.N.Y.1979). Plaintiff Giroir obtained the letter of credit as a backup source of payment for promissory notes that he had given to the former stockholders of the First National Bank of Fayetteville, whose stock

of $13,209,000. In conjunction with the letter of credit, plaintiff Giroir executed a promissory note to MBank for $13,209,000. As collateral, he pledged 133,000 shares of Worthen Bank stock and some promissory notes payable to him by the Balder Corporation.[2] Stock, Inc., a corporation of which plaintiff Giroir is the sole stockholder, pledged a certificate of deposit worth $1,864,000 [3] and 109,000 shares of Worthen Bank stock as additional collateral.[4]

On the same day that the letter of credit was issued, FirstSouth, a savings and loan association, "assume[d] and agree[d] to pay and perform" plaintiff Giroir's obligations to MBank under the letter of credit and the promissory note.[5] As security for First-South's assumption of these obligations, FirstSouth pledged all of its current and future assets, including three Treasury notes worth $6,000,000 and two Federal National Mortgage Association securities worth $6,400,000. FirstSouth's liability under the assumption agreement, however, was limited to $8,500,000 or the fair market value of the collateral it had pledged,[6] whichever was greater. The assumption agreement states that plaintiff Giroir was to "remain obligated and liable" on the letter of credit and the promissory note. Under the terms of the assumption agreement, to which plaintiff Giroir, FirstSouth, and MBank were all parties, MBank had the right to "sell, exchange, release, substitute, or otherwise deal with all or any part of the property now or hereafter securing" the obligations.[7]

In early December, 1986, the Federal Home Loan Bank Board declared First-South insolvent. The Federal Savings and Loan Insurance Corporation (FSLIC) was appointed as receiver for FirstSouth at that time.

In January, 1985, FirstSouth had issued a commitment letter [8] to plaintiff Giroir stating that FirstSouth would lend plaintiff $3,894,872 in four installments over four years.[9] When FSLIC took over as a receiver for FirstSouth, it repudiated the commitment letter to plaintiff Giroir and refused to lend him the money that he had been expecting for December, 1986. As a result, plaintiff Giroir was unable to make payments on his promissory notes to the former stockholders of the First National Bank of Fayetteville. The former stockholders then drew on the letter of credit from MBank and were paid $13,184,554 by MBank in January, 1987.

In late January, 1987, MBank notified FirstSouth, by then in receivership, that the letter of credit had been drawn upon and that MBank therefore intended to call on FirstSouth to repay it under the terms of the assumption agreement. MBank ad-

---

in that bank he had bought in December, 1983. The letter of credit obligated MBank to pay the trust department of the First National Bank of Fayetteville as agent for the former stockholders of the bank. In other words, plaintiff Giroir owed the stockholders, and MBank agreed to pay them if he did not, with Giroir to repay MBank if it had to pay the stockholders.

2. The promissory notes from Balder were for $5,586,635 and were themselves secured by 207,000 shares of Worthen Bank stock.

3. The certificate was on deposit with MBank.

4. Stock, Inc., apparently executed three security agreements, each pledging 250,000 shares of Worthen Bank stock. It is not clear whether these are duplicates of each other or if the total stock pledged was 750,000 shares. MBank filed them as three separate agreements in a later lawsuit.

5. Why FirstSouth assumed this responsibility is not clear. It was obviously the result of some agreement between plaintiff Giroir and First-South that has not been made available to the court.

6. The fair market value was to be determined by MBank, presumably whenever the collateral was called in.

7. It is not clear whether this language relating to "the property" securing the obligations refers only to FirstSouth's collateral or also to plaintiff Giroir's collateral. Since this language appears in the assumption agreement, the court presumes that it applies only to FirstSouth's property.

8. The court does not have a copy of this letter.

9. The installment for December, 1985, was $864,779; the installment for December, 1986, was to be $937,405; the installment for December, 1987, was to be $1,010,031; and the installment for December, 1988, was to be $1,082,657.

vised FirstSouth that, if the debt was not repaid, it would foreclose on the collateral pledged by FirstSouth, including the Treasury notes and the Federal National Mortgage Association securities. Allegedly acting both in its corporate capacity and as receiver for FirstSouth, FSLIC immediately sued in federal court in Dallas to enjoin MBank from foreclosing on FirstSouth's collateral.

In July, 1987, FSLIC, allegedly acting in its corporate capacity only, bought plaintiff Giroir's promissory note from MBank. MBank then transferred to FSLIC the security interests in the Worthen Bank stock, the Balder Corporation promissory notes, and the certificate of deposit. FSLIC then agreed to the dismissal of its lawsuit against MBank.

In early August, 1987, FSLIC notified plaintiff Giroir of its intention to foreclose on the collateral. On August 18, 1987, plaintiff Giroir applied *ex parte* to this court for a temporary restraining order to enjoin the transfer from MBank to FSLIC of any of plaintiff Giroir's collateral. The order was issued, and although the collateral had already been transferred to FSLIC, the foreclosure action was apparently postponed. Two days later, this court held a full hearing and vacated the temporary restraining order and denied a preliminary injunction.

In September, 1987, plaintiff Giroir filed an amended complaint, alleging that because FSLIC had the power to buy his promissory note from MBank only in its capacity as receiver for FirstSouth, the purchase of that promissory note was a discharge by FirstSouth of his indebtedness to MBank. As a consequence, plaintiff Giroir alleges, instead of transferring his collateral to FSLIC, MBank should have returned the collateral to him.

Plaintiff Giroir sues MBank for breach of contract, conversion, and breach of fiduciary duty and asks for compensatory damages of $9,000,000 and punitive damages of $20,000,000.

FSLIC moved to intervene as a defendant. The court has granted that motion.

Before the amended complaint was filed, MBank had moved to dismiss. The only contention contained in that motion that is still in issue [10] is that venue is improper because of the choice-of-forum clauses in the letter of credit application and agreement and the security agreements. After the amended complaint was filed, MBank again moved to dismiss, contending in addition that the amended complaint failed to state a claim, especially one for punitive damages, and asking, in the event the case is not dismissed, that the court transfer it to the federal district court in Dallas.

The motions to dismiss will be denied, and the case will be transferred to the federal district court for the Northern District of Texas, Dallas Division.

### I.

■ MBank's arguments as to the first amended complaint's alleged failure to state a claim are factual arguments, supplemented by references to documents outside the amended complaint, and thus are better suited for a summary judgment motion. They cannot, of course, be considered on a motion to dismiss.

■ Count 1 of plaintiff Giroir's complaint clearly alleges the elements of a claim for breach of contract, *i.e.*, the existence of a valid and enforceable contract between the parties, the obligation of the defendant under the contract, a violation by the defendant, and the resultant dam-

---

**10.** MBank first contended that the application for temporary restraining order failed to state a claim against MBank, the collateral having been transferred before the application was filed. That issue has been mooted by the court's vacating of the temporary restraining order and grant of leave to plaintiff Giroir to file an amended complaint.

MBank also contends that FSLIC should have been joined as an indispensable party. That issue has been mooted by the court's grant of leave to FSLIC to intervene.

Finally, MBank contended that the application for temporary restraining order failed to state a claim against Balder Corporation, which had also been named as a defendant. That issue has apparently been mooted by the filing of the amended complaint, which does not name Balder Corporation as a defendant.

ages to the plaintiff. *See, e.g., Koenning v. Manco Corp.,* 521 S.W.2d 691, 699–700 (Tex.Civ.App.1975); *Rabalaias v. Barnett,* 284 Ark. 527, 528–29, 683 S.W.2d 919 (1985).

■ Count 2 of plaintiff Giroir's complaint clearly alleges the elements of a claim for conversion, *i.e.,* ownership of property by the plaintiff and the exercise of dominion over the property by the defendant in violation of the plaintiff's rights. *See, e.g., Staats v. Miller,* 240 S.W.2d 342, 344 (Tex.Civ.App.1951), *rev'd on other grounds,* 243 S.W.2d 686 (Tex.1951); *Auston v. Loyd,* 533 F.Supp. 737, 740 (W.D. Ark.1982), *aff'd,* 691 F.2d 503 (8th Cir. 1982).

■ Count 3 of plaintiff Giroir's complaint clearly alleges the elements of a claim for breach of fiduciary duty, *i.e.,* the existence of a fiduciary relationship between the parties, a breach of the defendant's duty to the plaintiff within that relationship, and the resultant damages to the plaintiff. *See, e.g., Watson v. Limited Partners of WCKT, Ltd.,* 570 S.W.2d 179, 182 (Tex.Civ.App.1978); *Raines v. Toney,* 228 Ark. 1170, 1179–80, 313 S.W.2d 802 (1958).

■ As for punitive damages, both tort counts allege that MBank's conduct was willful, intentional, and in conscious disregard of plaintiff Giroir's rights. This is sufficient to state a claim for punitive damages. *See, e.g., InterFirst Bank Dallas, N.A. v. Risser,* 739 S.W.2d 882, 907 n. 29 (Tex.Ct.App.1987); *Johnson v. Brace,* 472 F.Supp. 1056, 1060 (E.D.Ark.1979).

The complaint plainly states a claim. The next question to be addressed, then, is whether the choice-of-forum clauses in plaintiff Giroir's letter of credit application and agreement and the security agreements require dismissal of this case.

## II.

■ The letter of credit application and agreement executed by plaintiff Giroir and accepted by MBank contains the following language: "This Agreement is made and is performable in Dallas County, Texas, and the undersigned [plaintiff Giroir] waives the right to sue or be sued hereon elsewhere." The security agreements executed by plaintiff Giroir and Stock, Inc., contain this language: "This Agreement shall be construed in accordance with the ... applicable laws of the State of Texas and any proceeding hereunder shall be in Dallas County, Texas." The assumption agreement executed by plaintiff Giroir, FirstSouth, and MBank provides: "This Agreement shall be governed by and construed in accordance with the laws of the State of Texas and shall be performable in Dallas, Texas." MBank contends that these provisions prevent plaintiff Giroir from bringing his lawsuit in Arkansas.[11]

In *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 2, 92 S.Ct. 1907, 1909, 32 L.Ed.2d 513 (1972), the Supreme Court examined a choice-of-forum clause in a towing contract that specified that "[a]ny dispute arising" was to be "treated before" a London court. The Court found that "absent some compelling and countervailing reason," *id.* at 12, 92 S.Ct. at 1914, why "enforcement would be unreasonable and unjust," *id.* at 15, 92 S.Ct. at 1916, such as the fact that a choice-of-forum clause had been procured in circumstances suggesting "fraud, undue influence, or overweening bargaining power," *id.* at 12, 92 S.Ct. at 1914, such clauses "are prima facie valid,"

---

**11.** Plaintiff Giroir states that "[a]ll" of his claims "are based upon" MBank's failure to return his collateral pursuant to the assumption agreement only, and not on any of MBank's acts in relation to the letter of credit application and agreement or the security agreements. The assumption agreement itself has no explicit choice-of-forum clause but merely asserts that it is to be governed by Texas law.

This is not a reasonable characterization of plaintiff Giroir's claim. The essence of his cause of action is that MBank's right to possession of his collateral under the security agreements was terminated because the debt the collateral was intended to secure was extinguished. Therefore, plaintiff Giroir's argument runs, MBank owed him the collateral, because the security agreements had run their course. This case thus plainly arises under the letter of credit application and agreement, the security agreements, or both, and not under the later assumption agreement.

*id.* at 10, 92 S.Ct. at 1913, and "should be honored by the parties and enforced by the courts." *Id.* at 12, 92 S.Ct. at 1914.

That case was an admiralty case, and the Court described the doctrine summarized above as the correct one "to be followed by federal district courts sitting in admiralty." *Id.* at 10, 92 S.Ct. at 1913. However, the Court's discussion of the reasons why such clauses should be enforced absent unusual circumstances was not limited to reasons peculiar to admiralty cases. The Court alluded to "ancient concepts of freedom of contract," *id.* at 11, 92 S.Ct. at 1914, and referred to "the elimination [by agreement] of all ... uncertainties" as to where a suit might be brought as an "indispensable element in international trade, commerce, and contracting." *Id.* at 13–14, 92 S.Ct. at 1915. The Court also referred favorably to "the view advanced by noted scholars" and adopted by the American Law Institute, *id.* at 11, 92 S.Ct. at 1914, that an agreement as to the place of an action cannot oust a state (or, by implication, a federal court) of judicial jurisdiction but will be given effect unless the agreement is unfair or unreasonable. *See Restatement (Second) of Conflict of Laws* § 80 (1971). Finally, the Court described the doctrine that choice-of-forum clauses should ordinarily be enforced as being "merely the other side of the proposition recognized by [the] Court in *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311 [84 S.Ct. 411, 11 L.Ed.2d 354] (1964), holding that in federal courts a party may validly consent to be sued in a jurisdiction where he cannot be found for service of process through contractual designation of an 'agent' for receipt of process in that jurisdiction." *Id.* at 10–11, 92 S.Ct. at 1913. *National Equipment Rental,* 375 U.S. at 311, 84 S.Ct. at 411, was a diversity case construing a clause in a farm equipment lease.

In *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), the Supreme Court cited its decision in *The Bremen,* 407 U.S. at 1, 92 S.Ct. at 1907, as authority for a holding that an "agreement to arbitrate before a specified tribunal," as "a specialized kind of forum-selection clause," was "to be respected and enforced by the federal courts." *Scherk,* 417 U.S. at 518–20, 94 S.Ct. at 2456–58. The Court characterized "[a] contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied" as "an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." *Id.* at 516, 94 S.Ct. at 2455. The Court went on to declare that "such a provision obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved." *Id.*

Both *The Bremen,* 407 U.S. at 1, 92 S.Ct. at 1907, and *Scherk,* 417 U.S. at 506, 94 S.Ct. at 2449, dealt with contracts involving international trade. However, the reasons given by the Supreme Court in those cases for honoring choice-of-forum clauses—freedom of choice, the elimination of uncertainty, and the advisability of orderliness in business relations—are equally applicable to domestic contracts. Indeed, several appellate courts have stated that the rule announced in *The Bremen,* 407 U.S. at 12, 92 S.Ct. at 1914, applies in nonadmiralty, domestic contract cases. *See, e.g., Stewart Organization, Inc. v. Ricoh Corp.,* 810 F.2d 1066, 1069 (11th Cir.1987) (en banc) (per curiam), *cert. granted,* —— U.S. ——, 108 S.Ct. 225, 98 L.Ed.2d 184 (1987); *Luce v. Edelstein,* 802 F.2d 49, 57 (2d Cir.1986); *Bryant Electric Co. v. City of Fredericksburg,* 762 F.2d 1192, 1196 (4th Cir.1985); *Pelleport Investors, Inc. v. Budco Quality Theatres, Inc.,* 741 F.2d 273, 279 (9th Cir. 1984); *LFC Lessors, Inc. v. Pacific Sewer Maintenance Corp.,* 739 F.2d 4, 6 n. 1 (1st Cir.1984); *Snyder v. Smith,* 736 F.2d 409, 419 (7th Cir.1984), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984); and *In–Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 234 n. 24 (6th Cir.1972). *See also* 15 C. Wright, A. Miller, and E. Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 3803.1 (1986); R. Leflar, *American Conflicts Law* § 52 (3d ed. 1977); and Annotation, *Validity of Contractual Provision Limiting Place or*

*Court in Which Action May Be Brought,* 31 A.L.R. 4th 404 (1974), especially § 4 at 415.

The Eighth Circuit has looked at choice-of-forum clauses at least three times. In *McDonnell Douglas Corp. v. Islamic Republic of Iran,* 758 F.2d 341, 345 (8th Cir. 1985), *cert. denied,* 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 294 (1985), the court found that even if a clause stating that disputes "should be settled through Iranian courts" was mandatory, the chaotic postrevolutionary conditions in Iran, including its ongoing war with Iraq, provided a "compelling and countervailing reason," *see The Bremen,* 407 U.S. at 12, 92 S.Ct. at 1914, not to enforce the clause. The court concluded that the circumstances prevailing in Iran were so "gravely difficult, inconvenient and dangerous" that the American corporation challenging the clause "would for all practicable purposes be deprived of its day in court." *McDonnell Douglas,* 758 F.2d at 346.

In *Sun World Lines, Ltd. v. March Shipping Corp.,* 801 F.2d 1066, 1068 (8th Cir.1986), the appeals court held that if the dispute was considered to be within the district court's admiralty jurisdiction, then admiralty law would prevail over state law if the two were in conflict and that under admiralty precedent, the choice-of-forum clause in question would be enforceable because of the holding in *The Bremen,* 407 U.S. at 12, 92 S.Ct. at 1914. The appeals court also held, alternatively, that if the dispute was considered to be within the district court's diversity jurisdiction, then venue was "clearly a federal procedural issue and ... federal law controls," which would also mean that the clause was enforceable under *The Bremen,* 407 U.S. at 12, 92 S.Ct. at 1914. *Sun World Lines,* 801 F.2d at 1069.

However, in *Farmland Industries, Inc. v. Frazier–Parrott Commodities, Inc.,* 806 F.2d 848, 852 (8th Cir.1986), the court retreated from its alternative position in *Sun World Lines,* 801 F.2d at 1066, characterizing its earlier discussion of the procedural nature of choice-of-forum clauses as "not

essential to the outcome because the court had already found that admiralty law was at issue." *Farmland Industries,* 806 F.2d at 852. The court explained: "Whether a contractual forum selection clause is substantive or procedural is a difficult question. On the one hand the clause determines venue and can be considered procedural, but on the other, choice of forum is an important contractual right of the parties. Because of the close relationship between substance and procedure ... consideration should [be] given to the public policy" of the state where the suit was brought. *Id.*

The language in the Supreme Court opinions dealing with choice-of-forum clauses is not helpful in deciding whether the Court views such clauses as a substantive or a procedural problem. *The Bremen,* 407 U.S. at 15, 92 S.Ct. at 1916, does state that a "contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or judicial decision." This seems to suggest that the Court considers forum selection a substantive matter. However, in that same case, the Court's statement that choice-of-forum clauses are "merely the other side" of a proposition dealing with service of process through a contractually designated agent, *id.* at 10–11, 92 S.Ct. at 1913–1914, seems to suggest that forum selection is a procedural matter.

### III.

■ Assuming for the moment that choice-of-forum clauses are substantive in nature, as the Eighth Circuit may have suggested in *Farmland Industries,* 806 F.2d at 852, this court, sitting in diversity, is faced with still another problem—whether Arkansas law or Texas law would govern the question of the validity of the clauses. In other words, if this case had been brought in an Arkansas state court, would that court have looked to Arkansas law or Texas law in determining the validi-

ty of the choice-of-forum clauses? [12]

This case was brought in Arkansas, but the letter of credit application and agreement and the security agreements seem to anticipate that Texas law will apply. Under Arkansas conflicts law, a court is to look at three factors in determining what substantive law to apply to multi-state contracts—the law where the contract was made, the law where the most essential features of the contract were to be performed, and the law of the state intended by the parties to govern the contract. *See, e.g., Grogg v. Colley Home Center, Inc.,* 283 Ark. 120, 123, 671 S.W.2d 733 (1984).

■ The letter of credit application and agreement was made in Dallas. The court has no explicit information as to where the security agreements were made; however, since they were executed on the same day as the letter of credit application and agreement, the court assumes that all of the contracts were made in Dallas. The letter of credit application and agreement specify that they are performable in Dallas; it is not clear where the security agreements were to be "performable," but since they were made in furtherance of the letter of credit arrangement, the court assumes that they were performable in Dallas as well. All of the contracts at issue specify that the parties' intention is for Texas law to govern the contracts. Considering all of these facts, the court believes that an Arkansas state court would apply Texas law in interpreting the choice-of-forum clauses in the letter of credit application and agreement and the security agreements unless to do so would contravene some important public policy of Arkansas. *See, e.g., Grogg,* 283 Ark. at 123, 671 S.W.2d 733 (an exception to the application of the three-factor test as to which state's substantive

law to apply would arise if the laws of the other state were a sham for avoiding the usury prohibitions of Arkansas law). *See also The Bremen,* 407 U.S. at 15, 92 S.Ct. at 1916 ("[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision"). No "strong public policy," *id.,* has been declared by either the courts or the legislature of Arkansas in these kinds of matters. The court turns, then, to the treatment of choice-of-forum clauses by the Texas courts.

■ Under the Texas case law, choice-of-forum clauses are not enforceable unless the choice made is in conformity with the Texas venue statutes.[13] *See Fidelity Union Life Insurance Co. v. Evans,* 477 S.W. 2d 535, 537 (Tex.1972). Under the Texas venue statutes, suits "on or by reason of" a contract in writing are to be brought either in the county named by the contract as the place of performance or the county where the defendant is domiciled. *See* Tex.Civ. Prac. and Rem.Code Ann. § 15.035(a) (Vernon 1986); *see also* Tex.Civ.Prac. and Rem. Code Ann. § 15.092 (Vernon 1986), which restricts the venue to the place of performance. The letter of credit application and agreement specifies that performance is to be in Dallas County, Texas. And since the security agreements were made in furtherance of the letter of credit arrangement, it is reasonable to conclude that the parties intended them to be performed in Dallas County as well. If Texas law governs, then a choice-of-forum clause specifying Dallas as the forum for a suit "on or by reason of" the letter of credit application and agreement, *see* Tex.Civ.Prac. and Rem.

**12.** The court has found no cases where Arkansas courts construed such clauses, so, in keeping with the apparent inclination of the Eighth Circuit, expressed in *Farmland Industries,* 806 F.2d at 852, the court assumes that an Arkansas court would consider such clauses a matter of substantive law.

**13.** Interestingly, a federal district court in Texas faced with a choice-of-forum clause found it to be a procedural matter controlled by federal law and therefore enforceable absent unusual

circumstances. *See Taylor v. Titan Midwest Construction Corp.,* 474 F.Supp. 145, 147, 149 (N.D.Tex.1979). The opinion contains a good summary of the quandary presented to a federal court in a diversity contract case—deciding whether the provision is substantive or procedural, and if substantive, which state's conflicts law will control, how that conflicts law will treat the provision, and therefore which state's law will ultimately control. *Id.* at 147 nn. 1, 2.

Code Ann. § 15.035(a) (Vernon 1986), would be enforceable in the Texas courts, because Dallas is the specified place of performance in that document. Moreover, even if the suit is considered to be "on or by reason of" the security agreements only and even if the place of performance of the security agreements is not Dallas or is indeterminable, MBank is domiciled in Dallas, which would make venue proper there regardless of the place of performance. *See* Tex.Civ. Prac. and Rem.Code Ann. § 15.035(a) (Vernon 1986). Thus Texas law would uphold the choice-of-forum clauses in either the letter of credit application and agreement or the security agreements.

 Assuming, alternatively, that choice-of-forum clauses are procedural in nature, then *The Bremen,* 407 U.S. at 1, 92 S.Ct. at 1907, as federal law, would control, and the choice-of-forum clauses would be enforceable absent "fraud, undue influence, or overwhelming bargaining power," *id.* at 12, 92 S.Ct. at 1914. There has been no showing by the plaintiffs of any of these factors.

### IV.

In *The Bremen, id.* at 16, 92 S.Ct. at 1916, the Supreme Court suggested that even though a choice-of-forum clause has been "freely bargained for and contravenes no important public policy of the forum,"[14] such a clause may still be " 'unreasonable' and unenforceable if the chosen forum is *seriously* inconvenient for the trial of the action. [Emphasis in original.] Of course, where it can be said with reasonable assurance that at the time they entered the contract, the parties to a freely negotiated private ... commercial agreement contemplated the claimed inconvenience, it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable." The court agrees.

It seems clear, therefore, that regardless of whether the court considers the choice-of-forum clauses to raise a substantive or a procedural issue, they are enforceable against the plaintiffs.

14. Here, the clause has not been demonstrated to contravene any important public policy of

### V.

 The final question to be determined is whether to dismiss the case or transfer it to the federal court in Dallas. If a case is filed where venue is in the wrong district, the district court "shall dismiss, or if it be in the interest of justice, transfer such case to any district ... in which it could have been brought." 28 U.S.C. § 1406(a). The court believes that it is in the interest of justice to transfer this case to the Northern District of Texas, Dallas Division. There seems to be no real point in dismissing the case, since the parties have already invested a considerable amount of time and money in it, since discovery has already begun, and since the plaintiffs are likely to refile it almost immediately. The court will therefore order the transfer of this case to the federal district court for the Northern District of Texas, Dallas Division.

either Arkansas, where the suit was brought, or Texas, whose substantive law applies.